UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DONALD J. ENGLERT, II,

                                        Petitioner,          DECISION AND ORDER

-vs-
                                                             18-CV-6871 (CJS)

MICHAEL COLVIN, *Superintendent of*
*Five Points Correctional Facility*,

                                        Respondent.

_____

        In 2013, Petitioner Donald J. Englert, II, was convicted of course of sexual conduct against

a child in the first degree after a jury trial in the Monroe County (New York) Court. The trial court

sentenced him to twenty-two years of imprisonment and five years of post-release supervision.

Englert now applies to this Court for habeas relief pursuant to 28 U.S.C. § 2254, arguing that he

was denied the effective assistance of counsel when his trial attorney failed to consult available

psychiatric and medical experts, and failed to properly cross-examine the prosecution's expert

witnesses. Am. Pet., 5, Aug. 23, 2019, ECF No. 10. Englert also maintains that a combination

of improper evidentiary rulings by the trial court deprived him of a fair trial. Am. Pet. at 7.

Respondent opposes Englert's application. For the reasons set forth below, Englert's application

[ECF No. 1] is denied.

BACKGROUND

        On August 21, 2012, the Monroe County (New York) Grand Jury charged Englert with

one count of course of sexual conduct against a child in the first degree. State Tr., 3:17–20,[1]

May 18, 2020, ECF No. 25-1. Prior to trial in January 2013, the prosecution filed an application

_____

[1] The page numbers identified for the "State Transcript," ECF No. 25-1, in this matter are the consecutive page numbers assigned to the electronic filing by the Court's "Case Management / Electronic Case Files" ("ECF") system.

seeking permission to offer evidence of Englert's prior sexual practices with his ex-wife and his ex-girlfriend, including his alleged preferences for anal sex and using a cherry flavored lubricant on his penis so that it would taste better during oral sex. State Tr. at 91:7–23. The prosecution also asked to introduce evidence of Englert's affinity for pornography involving adult women dressed as young girls. State Tr. at 92:1–17. Despite defense counsel's objections, the trial court agreed with the prosecution that testimony regarding Englert's "unique" sexual practices was relevant and admissible. State Tr. at 557:15. However, the trial court denied the prosecution's request to elicit testimony regarding Englert's tastes in pornography. State Tr. at 559:4–5.

The victim, N.L., was twelve years old at the time of trial, and testified that she was four or five years old when Englert started living with her and her mother, Beth.[2] He lived with them for approximately two years while he was dating Beth, and then N.L. saw him at least twice a week for the following three years when her mother would drop her and her brother at Englert's residence so that he could babysit the children while Beth went to work or college. N.L. testified that when she was five years old, Englert started touching her over her clothes on her "breasts, butt and vagina," and that the touching got more serious when she was six or seven. She stated that he had his computer downstairs in the basement, and that when she sat on his lap, he would start touching her over her clothes, and then move under her clothes. When asked to explain a specific time, N.L. related that one time while Englert was living with her and Beth, N.L. went and sat on his lap and Englert began touching her, then slipped his finger into her vagina and it "burned."

Once Englert moved out, N.L. explained that he continued to touch her vagina, breasts and butt when they were together. She related the story of a time that she was eight or nine and

---

[2] N.L's entire testimony is at State Tr. at 605–789.

Englert was babysitting her and her brother at their apartment in East Rochester, when he took N.L. up to her bedroom, and pulled off her clothes. She stated that once her clothes were off, Englert laid on the bed, took off his pants, and tried to put his penis in her vagina, "but it didn't work, because it hurt so much, that he stuck it in my butt." His hands were on her hips, his penis was between her butt cheeks, and he was moving her body up and down "[l]ike I was humping him." N.L. also related at least one incident in Englert's car, when he stopped at the side of "an empty road . . . with lots of trees" and pulled her on top of him with her clothes on. He positioned her on top of him, facing him, and used his hands to "make me hump him" through their clothes. She remembered that "whenever a car would go by, he would push me off of him, and pretend to talk on the phone."

N.L. testified that Englert would also touch her while he was babysitting her and her brother at his residence, where she would frequently stay overnight. She recounted that more than once they would be in his bedroom, and his back would be on the bed while her naked body was on top of him facing toward him, and he "would make me say stuff," such as "when he got his penis in my vagina, say, fuck me." His penis hurt her when it went in her vagina, but it only went in "a little bit." When she told him that it hurt, "he would take it out and put it in my butt" and it would feel "slimy, gross."

N.L. testified that "it got more serious" when Englert moved to another house around the time she was ten years old. She would sleep at the house "mostly every weekend" in bed with Englert, and he would have her watch pornography with him in his bedroom, then try to put his penis in her vagina. Additionally, N.L. recalled a time that Englert made her take a shower with him, and that he picked her up, and wrapped her legs around his waist with his penis touching her vagina. She even related that one time she asked to stop because she had to go to the

bathroom, but Englert told her to pee on him because he was "almost done." She also stated that he made her "suck on his penis" after he applied a "cream" from a tube with cherries on it, which he told N.L. would make his penis taste better. N.L. testified that Englert frequently cautioned her not to tell anyone about his conduct so that "Daddy" wouldn't get into trouble. N.L. testified that, as a result, she did not reveal Englert's abuse until 2012, approximately two years after he had moved to California.

N.L.'s mother, Beth, testified that she had been in a romantic relationship with Englert, including having a child with him, that lasted from approximately the time that N.L. was two until she was almost six. She stated that although N.L. had informed her that Englert abused her, she was unaware of the specific details as to how. Nevertheless, Beth testified that in her own relationship with Englert, he "was very big on anal sex," and that there were times he would use "flavored gel type stuff" to entice her to perform oral sex on him. The gel was in a bottle with something "fruity" on the label. Beth also affirmed that she and Englert remained close friends after they began living apart, and that Englert was her "go-to" person for babysitting – including many overnights – until he moved to California in 2010.

N.L.'s grandmother testified at trial, too. In particular, she related the story of one morning during the time that Englert lived with Beth and N.L., when she arrived at their residence unannounced. Englert was home alone with N.L., while Beth was at the hospital with their son. N.L.'s grandmother testified that when she arrived, N.L. greeted her very tentatively at the door but ran back to Englert on the couch and attempted to remove a comforter that covered his lap. When N.L. was successful in pulling away the comforter, the grandmother realized that Englert was in his boxer shorts only, and she believed that he had an erection. The grandmother testified that N.L. continued to grab and look at Englert's boxer shorts, while making "an a-a-h type noise

toward him." State Tr. at 1126:22–24. She asked Englert "what the hell [N.L.] was looking for" in his boxer shorts, and he responded that they had just been "playing around." State Tr. 1128:18–19. She never told anyone about the incident, and maintained a good relationship with Englert until learning of N.L.'s allegations of abuse.

With respect to expert testimony, the prosecution called Stefan Perkowski, a licensed clinical social worker who at that time had served as program director at Child and Adolescent Treatment Services in Buffalo, New York for over 20 years, and had worked with over 3,100 children throughout his 37-year career. State Tr. at 796. Prior to Perkowski's testimony, defense counsel moved the trial court to preclude any testimony about Child Sexual Abuse Accommodation Syndrome (CSAAS), on the basis that it had not been generally accepted in the relevant scientific community. State Tr. at 793–94. The trial court denied counsel's motion on the basis of the New York Court of Appeals' decision allowing CSAAS testimony in *People v. Spicola*, 16 N.Y.3d 441, 947 N.E.2d 620  (N.Y. 2011). In any event, Perkowski testified that he had no knowledge of any particular details of Englert's case, but that he had been called to provide the jury with information regarding patterns observed in children and their responses to sexual abuse. Specifically, Perkowski testified that children often delay the disclosure of abuse for a multitude of reasons, and that there was some degree of delayed disclosure in 95% of the 3,100 abused children that he had worked with. State Tr. at 813:5–6.

The prosecution also called Cecilia Lyons, a nurse practitioner with fourteen years of experience performing physical and medical exams on suspected victims of child sexual abuse at the Justice for Children's Advocacy Center. State Tr. at 1058. Lyons testified that she had received "intensive training specific to child sexual abuse," and conducted multiple examinations of children each week, which had amounted to close to 1,000 child sexual abuse examinations

performed during her 14-year career to that point. Lyons testified that of the child sexual abuse examinations she had conducted, less than 3% of the exams happened within 72 hours of the abuse. State Tr. at 1064:19.

In addition to being an expert child sexual abuse examiner, Lyons was the nurse practitioner who had performed the child sexual abuse examination on N.L. in June 2012. State Tr. 1065:22. Lyons explained that she had examined N.L.'s genitalia for signs of sexual abuse using a colposcope, "which is basically a microscope on wheels" that can magnify up to about 10,000 times. She further stated that "[t]he exam [of N.L.'s genitalia] was essentially normal. The edges of the hymen were smooth. There were no lacerations or tears . . . ." State Tr. at 1068:5–7. Further, Lyons testified – over defense counsel's objection – that less than 5% of the children she examines actually exhibit physical signs of sexual abuse because "it has been, usually, months, sometimes years, since the abuse occurred" and the physical injuries have had time to heal. State Tr. at 1071: 7–10. In other words, Lyons' testimony suggested to the jury that N.L.'s normal exam was not inconsistent with the abuse that she disclosed because "[t]he hymen had had time to heal . . . . [Lyons] would have expected her injuries to have been healed. It would be normal to have a normal exam." State Tr. at 1072:1–4.

In his defense, Englert called two witnesses and testified himself. Englert's brother, Thomas, testified that he had shared a residence, and then a room at a different residence, with Englert at various points during the time period that N.L. alleged Englert abused her. Thomas testified that the relationship he observed between N.L. and Englert was a loving father-daughter relationship, and that he never saw anything that raised any suspicions of sex abuse. State Tr. at 1163:7–8. The jury also heard the testimony of Englert's girlfriend, Therese, who Englert lived with when he moved to California. Therese testified that before Englert had moved to California,

6

she had seen him interact with N.L. via Skype. She also stated that although she wanted to try anal sex with Englert, he was "grossed out" and couldn't go through with it. State Tr. 1177:7–20. Lastly, Englert himself testified, detailed hostile family court proceedings that he had been engaged in with Beth over his ability to see their son once Englert moved to California, and firmly denied the abuse that N.L. disclosed. State Tr. 1191–1254.

The jury returned a verdict of guilty against Englert on the charge of course of sexual conduct against a child in the first degree. State Record ("SR"), 155, May 18, 2020, ECF No. 25. at 133, 139.[3] The trial court sentenced him to a determinate term of imprisonment of twenty-two (22) years, with five years of post-release supervision. State Tr. at 1424.

Englert appealed his conviction and sentence, arguing that improper evidentiary rulings by the trial court and the reception of inadmissible evidence so tainted Englert's trial that reversal was required, that Englert received the ineffective assistance of trial counsel when defense counsel failed to call a medical expert and object to inadvertent testimony, and that the verdict was against the weight of the evidence. SR at 2–3. The state appellate division ruled, among other things, that the trial court did not err in permitting the prosecution "to introduce evidence of [Englert's] sexual practices and/or proclivities with his former girlfriend" because the evidence was not related to any prior crime or misconduct and therefore "did not constitute *Molineux* evidence." SR at 198. The appellate division also found that Englert's contention "that the court erred in permitting the testimony of an expert with respect to child sexual abuse accommodation syndrome (CSAAS)" had been forfeited and was without merit, and that nurse practitioner Lyons' testimony "was well within the type of expert testimony that is accepted by the courts in New York." SR at 198. Englert's argument that he received the ineffective assistance of counsel was

---

[3] The page numbers referred to in the state court record are the bates numbers assigned by Respondent.

rejected because defense counsel's failure to obtain the testimony of an expert did not constitute ineffective assistance of counsel where the defendant had not shown that such testimony was available, that it would have assisted the jury in its determination, or that Englert was prejudiced by its absence. SR at 198. Leave to appeal to the New York Court of Appeals was denied in September 2015. SR at 211.

In February of 2018, Englert filed a motion in the state trial court for an order vacating his conviction pursuant to New York Criminal Procedure Law § 440.10 on the basis that he was denied the effective assistance of counsel, and that he was actually innocent of the crime for which he was convicted. SR at 288. In support of his motion, Englert filed an affidavit from himself and affidavits from several family members attesting to the fact that during the one meeting they had with defense counsel prior to trial, counsel assured them they did not need to consult with a medical expert because the burden was on the state to prove their case. SR at 288–307. Additionally, Englert submitted affidavits from pediatrician Jeffrey Bomze, M.D. (SR at 314–323) and clinical psychologist Norman J. Lesswing, Ph.D. (SR at 332–336), each of whom pointed out weaknesses in the testimony of Perkowski and Lyons, respectively, that they believed defense counsel ought to have brought to the jury's attention.

After reviewing Englert's submissions, the trial court determined that Englert was attempting to make the same argument in his § 440.10 motion as he did on direct appeal, except that "he now includes statements from witnesses that he claims would . . . have [resulted in] a different verdict had [the jury] heard the testimony of the new witnesses." SR at 377. Further, the trial court found that nothing in the "new evidence" would have assisted the jury in its determination, and that Englert had failed to show that he was prejudiced by its absence. SR at

378. Englert's motion to vacate his judgment of conviction was therefore denied. SR at 382. The state appellate division denied Englert permission to appeal the trial court's order. SR at 403.

Englert is now before this Court seeking habeas relief, reciting similar grounds to those argued on appeal: (1) that he was denied the ineffective assistance of counsel based on defense counsel's failure to consult available experts or properly cross-examine the prosecution's experts, and (2) that the trial court's evidentiary rulings allowing some of the expert testimony and allowing testimony regarding Englert's "sexual proclivities" deprived him of a fair trial.

## LEGAL STANDARD

Englert makes his habeas corpus application pursuant to 28 U.S.C. § 2254. The general legal principles applicable to such a claim are well-settled. Federal courts are obliged to give deference to state courts' decisions. *See Chrysler v. Guiney*, 806 F.3d 104, 117 (2d Cir. 2015) (citing The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214). "First, the exhaustion requirement ensures that state prisoners present their constitutional claims to the state courts in the first instance." *Jackson v. Conway*, 763 F.3d 115, 132 (2d Cir. 2014). Second, "[s]hould the state court reject a federal claim on procedural grounds, the procedural default doctrine bars further federal review of the claim, subject to certain well-established exceptions." *Id.* (citing *Wainwright v. Sykes*, 433 U.S. 72, 82–84 (1977)). Lastly, for claims adjudicated on the merits in state court, a federal court may issue a writ of habeas corpus only when the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law . . . ." *Chrysler*, 806 F.3d at 117 (quoting 28 U.S.C. § 2254(d)(1)).

With respect to the procedural bar referenced in the previous paragraph, the Supreme Court has held that claims underlying a habeas petition may be procedurally barred from habeas

review if they were decided at the state level on adequate and independent procedural grounds. *Coleman v. Thompson*, 501 U.S. 722, 729–33 (1991). In a case where a state court decision rests on an independent state law ground adequate to support the judgment, federal habeas courts defer to the "state's interest in enforcing its laws." *Garcia v. Lewis*, 188 F.3d 71, 76 (2d Cir. 1999) (quoting *Coleman*, 501 U.S. at 730–31). A ruling on an independent state law ground is adequate to support a judgment where the ruling is "firmly established and regularly followed" by the state courts. *Garcia*, 188 F.3d at 77 (quoting *Ford v. Georgia*, 498 U.S. 411, 423–24 (1991)).

Further, for those claims which the state court decided on their merits, a principle is "clearly established Federal law" for § 2254 purposes when it is embodied in a Supreme Court holding framed at the appropriate level of generality. *Washington v. Griffin*, 876 F.3d 395, 403 (2d Cir. 2017) (quoting, *inter alia*, *Thaler v. Haynes*, 559 U.S. 43, 47 (2010)). A state court decision is "contrary to" such clearly established law when the state court either has arrived at a conclusion that is the opposite of the conclusion reached by the Supreme Court on a question of law, or has "decided a case differently than the Supreme Court has on a set of materially indistinguishable facts." *Washington*, 876 F.3d at 403 (quoting *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000)). An "unreasonable application" of such clearly established law occurs when the state court correctly identifies the governing legal principle but unreasonably applies it to the facts of the particular case such that "the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Washington*, 876 F.3d at 403 (citation omitted).

DISCUSSION

Because Englert is proceeding on this petition *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). Nevertheless, after a review of the papers of both parties, and the transcripts and records of the state court proceedings, in accordance with Rule 8 of the Rules Governing Section 2254 Cases, the Court finds that an evidentiary hearing is not necessary to address Englert's arguments. *See also* 28 U.S.C. § 2254(e)(2).

<u>Ineffective Assistance of Counsel</u>

Englert maintains that he was denied his Sixth Amendment right to reasonably effective counsel when defense counsel failed to consult or to call available psychiatric or medical experts to rebut the prosecution's evidence, and when he failed to properly cross-examine the prosecution's expert witnesses, licensed clinical social worker Perkowski and nurse practitioner Lyons. Pet. at 6. Specifically, Englert points out that although there is no *per se* rule requiring attorneys to consult an expert, "the Second Circuit has repeatedly held that, in the context of sexual abuse cases, the 'failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel.'" Reply, 2, June 29, 2020, ECF No. 27 (quoting *Gersten v. Senkowski*, 426 F.3d 588, 607 (2d Cir. 2005)). "This is particularly so where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony." *Gersten*, 426 F.3d at 607.

Respondent counters that Englert did not receive constitutionally deficient representation. Respondent states that, viewed in the aggregate, counsel's performance was quite effective: he actively sought to suppress damaging evidence pre-trial, he articulated a cogent theory of the

case in opening and closing arguments, he "extensively cross-examined" the prosecution's witnesses, and he put on a defense case. In addition, Respondent argues that Englert has failed to show that he was prejudiced by counsel's purported errors. The Court agrees with Respondent that Englert's claim is without merit.

### Legal Principles

The Sixth Amendment guarantees a criminal defendant the right to "reasonably effective assistance" of counsel. To establish ineffective assistance of counsel, a defendant must satisfy the two-prong test outlined in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" under the "prevailing professional norms." *Vadas v. U.S.*, 527 F.3d 16, 20 (2d Cir. 2007) (citing *Strickland*, 466 U.S. at 688). Second, the defendant must demonstrate he was prejudiced by the ineffective conduct. *Strickland* at 687–88. A defendant's failure to satisfy one prong of this two-pronged test relieves the court of any requirement to consider the other prong. *Strouse v. Leonardo*, 928 F.2d 548, 556 (2d Cir. 1991).

### Application

In the present case, Englert roots his ineffectiveness claims in the Second Circuit's decision in *Gersten v. Senkowski*, 426 F.3d 588 (2d Cir. 2005), which found defense counsel was ineffective for failing to call his own psychological expert where the only direct evidence of sexual abuse was testimony of the victim. Englert argues that "the quality of the prosecution's evidence at . . . Englert's trial is none different than the evidence in *Gersten*." Reply at 3. In particular, Englert states that – as in *Gersten* – the prosecution's case here "rested centrally" on N.L.'s testimony "and its corroboration by . . . the [state's] medical expert." Reply at 3.

A closer look at Englert's analogy of his case to *Gersten* is warranted. *Gersten* involved the sexual abuse of a minor where there was no physical evidence of abuse. The prosecution presented the testimony of a psychological expert who testified generally about Child Sexual Abuse Accomodation Syndrome (CSAAS). The expert conceded that he could not offer any specific opinion regarding the victim, but that it was extremely rare that children lie about sexual abuse. *Gersten*, 46 F.3d at 597. "Defense counsel failed to consult or call an expert on the psychology of child sexual abuse, or to educate himself sufficiently on the scientific issues. Therefore he was unable to mount an effective cross-examination, and missed an opportunity to rebut this attempt at bolstering the alleged victim's credibility." *Gersten*, 426 F.3d at 611.

In this context, the Second Circuit observed that, "[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel." *Gersten*, 426 F.3d at 607 (2d Cir.2005) (citing cases); *see also Lindstadt v. Keane*, 239 F.3d 191, 202 (2d Cir.2001) (in sex abuse case, state court's conclusion that petitioner did not receive ineffective assistance was unreasonable where, inter alia, defense counsel did not consult or call medical expert to challenge prosecution's medical expert). The circuit court then held that "[d]efense counsel's lack of preparation and failure to challenge the credibility of the key prosecution witness could not be based on a sound trial strategy, and" therefore constituted ineffective assistance of counsel. *Id*.

Nevertheless, several years later, the Second Circuit made an important clarification of its ruling in *Gersten*:

> . . . *Gersten* does not create a requirement that defense attorneys in child sex abuse cases such as this must always consult with or call a CSAAS expert in rebuttal; rather, the opinion states that in the absence of expert consultation or use of an expert rebuttal witness, counsel may provide reasonable representation in the face of expert testimony on CSAAS by "educat[ing] [themselves] sufficiently on the scientific issues" to challenge such evidence effectively."

13

*Spicola v. Unger*, 703 F. App'x 51, 53 (2d Cir. 2017). This clarification is relevant to the present case, in which the differences with *Gersten* far outweigh the similarities.

On the one hand, like *Gersten*, the only direct evidence that the prosecution was able to present to prove that Englert sexually abused N.L. was the testimony of N.L. herself. Hence, to the extent that Perkowski's testimony regarding CSAAS explained N.L.'s delayed disclosure, it was, as in *Gersten*, important to the prosecution's case.

However, unlike the defendant's trial attorney in *Gersten*, who failed to educate himself sufficiently on the scientific issues relevant to the case, Englert's counsel was clearly familiar with Perkowski as an expert witness and possessed at least a basic awareness of the history and critiques of CSAAS. Further, defense counsel used his familiarity and awareness to attack the credibility of the theory. For instance, the following exchange occurred during defense counsel's cross-examination of Perkowski:

> [DEFENSE COUNSEL]: . . . . Now, you did testify, on direct examination, about Dr. Roland Summit; correct?
>
> [PERKOWSKI]: Yes.
>
> [DEFENSE COUNSEL]: And back in 1983, he is the one who developed [CSAAS]; correct?
>
> [PERKOWSKI]: Yes.
>
> [DEFENSE COUNSEL]: And I believe I have cross examined you before about Dr. Summit retracting his theory, in 1992, saying it was being abused in the Court system?
>
> [PERKOWSKI]: May I correct you, sir?
>
> [DEFENSE COUNSEL]: You have tried many times. Please do – please do it one more time.
>
> [PERKOWSKI]: Okay. He didn't retract it. He complained, quite appropriately, I think, that people in Kentucky misused it.

14

[DEFENSE COUNSEL]: Other people were abusing it?

[PERKOWSKI]: Other people, right.

[DEFENSE COUNSEL]: Yes.

[PERKOWSKI]: But he didn't retract it. What he did say is, if he knew that people would get confused, about the word syndrome, he wouldn't have used the word syndrome; and then, he went on to define it. And for those of us in the field, it's very clear, the people in Kentucky should not have done what they did.

[DEFENSE COUNSEL]: Well, from the studies I have read, relative to this issue, that it was more than Kentucky; throughout America, there were Counselors abusing the syndrome, coming into Courts and telling Jurors what to expect?

State Tr. 825:2–826:3.

Three additional differences with *Gersten* are important. First, defense counsel not only attempted to discredit CSAAS, but also called the relevancy of Perkowski's testimony into question by continually emphasizing during his cross-examination that the witness had no knowledge of the particular facts of N.L.'s case. *See, e.g.,* State Tr. at 833:7–10 (prosecution stipulating that Perkowski was not aware of any facts associated with the case). Second, approximately six years after *Gersten* was decided by the Second Circuit, the New York Court of Appeals found in the context of expert testimony about CSAAS that "evidence of psychological syndromes affecting crime victims [is] admissible for purposes of explaining behavior that might be puzzling to a jury." *People v. Spiccolo*, 16 N.Y.3d 441, 947 N.E.2d 620 (N.Y. 2011). *See also Spicola v. Unger,* No. 13-CV-020S, 2015 WL 4761451, at *1 (W.D.N.Y. Aug. 12, 2015), *aff'd*, 703 F. App'x 51 (2d Cir. 2017) (denying habeas relief because "*Gersten* does not dictate a finding of ineffective assistance . . . . [and] the failure to call a rebuttal witness is not, in and of itself, sufficient to establish that counsel's performance was deficient."). Hence, defense counsel prior to *Spiccolo* had at their disposal a greater array of challenges to CSAAS than were available to

defense counsel in the present case. Third, although the only direct evidence of abuse in the present case was N.L.'s testimony, there was stronger circumstantial evidence than in *Gersten*. Specifically, the consistency of the testimony of N.L. and Beth regarding the fruit-flavored gel Englert applied to his penis to entice others to perform oral sex on him, and N.L.'s grandmother's testimony regarding Englert's erection in his boxer shorts while at home alone with N.L., could both have been viewed by the jury as corroborating N.L.'s testimony.

Based on a careful review of the transcripts in this case, the Court concludes that "[b]ecause of his demonstrated familiarity with Perkowski and with the subject matter, the Court cannot find that it was unreasonable, as a matter of trial strategy, to refrain from consulting with, or offering the testimony of an expert and, instead, rely entirely on cross-examination to attack Perkowski's credentials, CSAAS theory, and the theory's application to the instant case." *Wallace v. Poole*, No. 10-CV-00722 MAT, 2011 WL 6370596, at *8–9 (W.D.N.Y. Dec. 20, 2011).

Similarly, the Court finds that defense counsel's strategy was not unreasonable with respect to the expert testimony of nurse practitioner Lyons. Whereas the Second Circuit took defense counsel in *Gersten* to task for his "failure to examine prior to trial the colposcopic slides that were made to record the physical evidence of trauma purportedly observed by" the medical expert, there is no evidence in the present case that Englert's counsel was unfamiliar with the images from N.L.'s exam. *Gersten*, 426 F.3d at 609. Nor does the cross-examination reflect defense counsel's ignorance of the various physical indicia of child sex abuse that Englert's purported expert, Dr. Bomze, suggests. On the contrary, defense counsel's cross-examination of Lyons involved extensive questioning on Lyons' observations of whether N.L.'s hymen was "smooth," "rolled," "transected," lacerated, torn or scarred. State Tr. at 1077–79, 1082. Defense counsel also questioned Lyons on her observations of the labia majora, labia minora, rectum,

and anus. He inquired whether Lyons observed any leukorrhea, petechia, lesions or scar tissue on N.L.'s genitalia, or any fissures, skin tags, anal warts, scarring, gaping anus, radial folds, concentric folds, sphincter lacerations or abrasions, or proctitis in N.L.'s anal area. State Tr. at 1081–91. Clearly, counsel was versed in the indicia of abuse, and employed the reasonable strategy of demonstrating the absence of such indicia in N.L.'s case to imply that no such abuse occurred.

Because Petitioner has failed to meet the first prong of Strickland of showing that defense counsel provided constitutionally deficient representation, the Court need not address the prejudice prong. *See Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) ("'[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.'" (alterations in original) (quoting *Strickland*, 466 U.S. at 697)). The state court's adjudication of this claim did not contravene or unreasonably apply settled Supreme Court law. Englert's ineffective assistance of counsel claim is meritless and is dismissed.

<u>Evidentiary Rulings</u>

Englert also maintains that he was denied a fair trial when the trial court erroneously (1) allowed testimony from Beth regarding his "alleged sexual proclivities," (2) permitted Perkowski and Lyons to testify to the ultimate issue of whether N.L.'s allegations were credible, (3) permitted Lyons to "bolster" N.L.'s allegations, and (4) permitted Perkowski to testify that it was normal for child sex victims to love their abusers, who are nearly always someone close to the child such as a step-father. Pet. at 7. However, Respondent argues that Englert's claim that he was denied a fair trial is without merit because, depending upon the particular evidentiary issue, his reliance on the issue is either procedurally barred or he has failed to demonstrate that the

state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law.

### Legal Principles

As discussed above, the Supreme Court has held that claims underlying a habeas petition may be procedurally barred from habeas review if they were decided at the state level on adequate and independent procedural grounds. *Coleman*, 501 U.S. at 729–33. Further, because federal habeas corpus relief does not lie for errors of state law, "[e]rroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue only where petitioner can show that the error deprived [him] of a fundamentally fair trial." *Taylor v. Curry*, 708 F.2d 886, 891 (2d Cir. 1983) (citing, *inter alia*, *Chambers v. Mississippi*, 410 U.S. 284, 302–03 (1973)). The due process guarantee of "fundamental fairness" is "a principle that the Supreme Court has 'defined . . . very narrowly.'" *Evans v. Fischer*, 712 F.3d 125, 133 (2d Cir. 2013) (quoting *Dowling v. United States*, 493 U.S. 342, 353 (1990)). Thus, a habeas petitioner challenging an evidentiary ruling "faces a doubly difficult challenge:" the petitioner must demonstrate that the rulings were so prejudicial to his defense that he was deprived of due process, *and* identify a Supreme Court case that clearly establishes the principle he claims the rulings to have violated. *Evans*, 712 F.3d at 133.

### Application

In the present case, Englert has failed to demonstrate that any of the evidentiary rulings he challenges rise to the level of constitutional error, either on their own or collectively. Consequently, the Court finds that the claim is without merit and must be dismissed.

First, there is no merit to Englert's contention that it was improper for the trial court to allow Beth's testimony regarding his use of the flavored gel to make oral sex taste better, and

his penchant for anal sex. As Respondent points out, the appellate division affirmed the trial court's decision to allow the testimony, stating that "[i]nasmuch as such evidence was not related to any prior crime or misconduct, we conclude that it did not constitute *Molineux* evidence." *People v. Englert*, 130 A.D.3d 1532, 1533 (N.Y. App. Div. 2015) (citing *People v Cortez*, 4 N.E.3d 952 (N.Y. 2014)). Indeed, these principles were affirmed by the New York Court of Appeals in a decision in a separate case the following year, which held "that evidence of defendant's prior sexual encounters with . . . [a] consenting adult woman was not *Molineux* evidence" because "*Molineux* analysis is limited to the introduction of a prior uncharged crime or a prior bad act." *People v. Brewer*, 66 N.E.3d 1057, 1060 (N.Y. 2016) (allowing evidence that defendant engaged in oral sex with the victims' mother and other consenting adult women in the exact same manner as he had forced the victims to: "in a closet, with his shirt pulled over his head, while smoking crack"). These principles also apply here, where N.L. testified that Englert also used the flavored gel to make oral sex taste better for her, and that he frequently put his penis between her butt cheeks.

Second, Englert's argument that the trial court erred when it permitted Investigator Aaron Bruce Dake to testify about his investigation into N.L.'s allegations, and particularly about his observation of N.L.'s forensic interview at the child advocacy center, is also without merit. In his testimony, Dake was permitted to make such statements as, "[a] forensic interview . . . is set up to seek the truth" (State Tr. at 997:6–9), and then follow that up with the statement that based on N.L.'s interview, he began to develop information to locate Englert (State Tr. at 1001:17). Englert raised this argument on direct appeal, and the state appellate division held that "inasmuch as the officer's testimony did not contain any statement of the victim, it could not be considered bolstering." *Englert*, 130 A.D.3d at 1533 (citing *People v. Ludwig*, 21 N.E.3d 1012

(N.Y. 2014)). After a careful review of the transcript, the Court finds nothing in Dake's testimony that is improper; he does not express an opinion on the ultimate issue of guilt. Therefore, habeas relief is not available on this claim.

Third, in regards to Englert's claim that nurse practitioner Lyons' testimony improperly "bolstered" N.L.'s allegations, the Court notes that it "it is well-settled that 'bolstering' is a state law issue that is not cognizable on federal habeas review." *Fernandez v. Artus*, No. 07CIV2532RJSAJP, 2009 WL 1586271, at *15 (S.D.N.Y. June 8, 2009) (citing *Warren v. Conway*, No. 07–CV–4117, 2008 WL 4960454 at *21 (E.D.N.Y. Nov. 18, 2008) ("While New York law prohibits bolstering, 'it is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process rights to a fair trial.'")). In any event, as the appellate division noted, Lyons' testimony was not bolstering under New York law, and "was well within the type of expert testimony that is accepted by the courts in New York." *Englert*, 130 A.D.3d at 1533.

Lastly, Englert's challenge to Perkowski's testimony regarding Child Sexual Abuse Accomodation Syndrome (CSAAS) must fail. To the extent the appellate division correctly found that Englert had failed to preserve the claim for appellate review as required by N.Y. Crim. Pro. § 470.05, Englert's challenge is barred from habeas review on "adequate and independent procedural grounds." *Coleman*, 501 U.S. at 729–30 (claims are procedurally barred from habeas review if rejected in state court on independent and adequate state-law procedural grounds); *Garvey v. Duncan*, 485 F.3d 709, 715–16 (2d Cir. 2007) (New York's contemporaneous objection rule is a "firmly established and regularly followed state law" and thus qualifies as "independent and adequate state law ground").

Englert's challenge also fails on the merits. As indicated above, pursuant to New York State law, CSAAS evidence is admissible "for the purpose of explaining behavior that might be puzzling to a jury." *Schroo v. LaValley*, No. 14-CV-06131 EAW, 2015 WL 105368, at *5 (W.D.N.Y. Jan. 7, 2015) (citing *Spicola*, 947 N.E.2d 620 (N.Y. 2011); *People v. Kirk*, 96 A.D.3d 1354, (N.Y. App. Div. 2012)). Additionally, Englert has failed to point to any Supreme Court caselaw that would suggest the admission of such evidence resulted in a conviction that was contrary to, or involved an unreasonable application of, clearly established Federal law.

CONCLUSION

Based on the foregoing, it is hereby ORDERED that Englert's application for habeas relief [ECF No. 1] is denied. Pursuant to 28 U.S.C. § 2253, the Court declines to issue a certificate of appealability, since Englert has not made a substantial showing of the denial of a constitutional right. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure. The Clerk of the Court is hereby ordered to close this case.

SO ORDERED.

Dated:      August 9, 2022
            Rochester, New York

ENTER:

CHARLES J. SIRAGUSA
United States District Judge

21